AO 106 (Rev. 04/10) Application for a Search Warrant

E-FILED
Wednesday, 15 May, 2019 02:02:47 PM
Clerk, U.S. District Court, ILCD

# UNITED STATES DISTRICT COURT

for the

Central District of Illinois

FILED

MAY 15 2019

CLERK OF THE COURT
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

In the Matter of the Search of

*(Briefly describe the property to be searched
or identify the person by name and address)*

The entire premises of 610 E. Kerr Ave. Apt. 105,
Urbana, IL 61802, more particularly described on Att. A.

)
)
)
)
)
)

Case No.  19-MJ-7 099

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

The entire premises of _____, Urbana, IL 61802, more particularly described on Att. A.

located in the _____Central_____ District of _____Illinois_____, there is now concealed *(identify the person or describe the property to be seized)*:

See Att. B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
| --- | --- |
| 18 U.S.C. § 2251(a) | Sexual Exploitation of a Minor |
| 18 U.S.C. § 2252 | Child Pornography Trafficking |
| 18 U.S.C. § 2252A | Child Pornography Trafficking |

The application is based on these facts:
See Affidavit of SA Joel C. Smith, FBI

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

s/Joel C. Smith

_____
*Applicant's signature*

SA Joel C. Smith, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

s/Eric I. Long

Date: _____05/15/2019_____

_____
*Judge's signature*

City and state:  Urbana, Illinois

Eric I Long, Magistrate Judge
*Printed name and title*

## AFFIDAVIT

I, Joel C. Smith, Special Agent of the Federal Bureau of Investigation (FBI), United States Department of Justice, having been first duly sworn, do hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I am a Special Agent with the Federal Bureau of Investigation, currently assigned to the Champaign, Illinois, office of the Springfield, Illinois, Division.  I have been employed as a Special Agent for the FBI since March 2016.  My duties as a Special Agent with the FBI include investigating violent crimes such as armed robberies, domestic terrorism, arson, and crimes relating to child exploitation and child pornography, including violations under 18 U.S.C. §§ 2251, 2252, and 2252A pertaining to, *inter alia*, the illegal production, distribution, receipt, possession, and advertisement of child pornography.  I have received training in the area of child pornography and child exploitation, and have had the opportunity to observe and review numerous examples of child pornography (as defined in 18 U.S.C. § 2256), in various forms of media including computer media.  I have gained experience in the conduct of such investigations through previous case investigations, formal training, and in consultation with law enforcement partners in local, state and federal law enforcement agencies.  I have participated in the execution of warrants to search and seize electronic devices, such as cellular telephones and computers.

1

2.      I am an investigative and law enforcement officer of the United States, who is empowered by law to conduct investigations of and to make arrests for the offense(s) enumerated in the possession and distribution of child pornography, Title 18 of the United States Code (U.S.C.), as amended. As an FBI Special Agent, I am authorized to execute warrants issued under the authority of the United States.

3.      The statements contained in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, law enforcement officers, and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.      This affidavit is made in support of a warrant to search the following:

a.      **The Subject Premises:** the entire premises of **610 E. Kerr Ave. Apt. 105, Urbana, IL 61802**. This premises is a two-story apartment building with blue and white aluminum siding that is located on the north side of Kerr Ave; a sign stating "CU Independence Apartments, 610 E. Kerr Ave." is displayed in front of the building.  Apartment 105 is on the first floor on the north east side of the building, the numbers "105" is affixed to the brown, wood grain door. The entire residence is hereinafter referred to as the "Subject Premises," further described in Attachment A1.

b.      **The Subject Persons:** any person located on the property, including specifically, **Scott M. Sanstrom** (DOB          '1981) provided they are

2

located on the Subject Premises and/or otherwise located in the Central District of Illinois, further described in Attachment A2.

5.     This warrant requests authority to search the subject premises and the subject persons for the items specified in Attachment B, which items constitute instrumentalities, fruits, and evidence of the violation of Title 18, United States Code, Sections 2251, 2252 and 2252A.

6.     As will be shown below, there is probable cause to believe that an individual at the subject premises has possessed visual depictions of minors engaged in sexually explicit conduct (as defined in 18 U.S.C. § 2256) ("child pornography") in violation of Title 18, United States Code, Sections 2252 and 2252A, and solicited, induced, enticed or coerced a minor to engage in sexually explicit conduct and produce an image of that conduct in violation of Title 18, United States Code, Section 2251(a). I am requesting authority to search the entire Subject Premises, including locked containers therein, as well as any computer, smartphone and computer media located therein where the items specified in Attachment B may be found, and to seize all items listed in Attachment B as instrumentalities, fruits, and evidence of crime.

## RELEVANT STATUTES

7.     This investigation concerns alleged violations of Title 18, U.S.C. § 2251, 2252, and 2252A relating to material involving the sexual exploitation of minors:

- **Sexual Exploitation of a Minor (18, U.S.C. § 2251(a)):** prohibits any person from employing, using, persuading, inducing, enticing, or coercing any minor to engage in, or having a minor assist any other

3

person to engage in, any sexually explicit conduct outside the United States, its territories or possessions, for the purpose of producing any visual depiction of such conduct if such person intends the visual depiction to be transported to the United States, its territories or possessions, by any means, including by using any means or facility of interstate or foreign commerce or mail, or the person transports such visual depiction to the United States its territories or possessions, by any means, including by using any means or facility of interstate or foreign commerce or mail.

- **Child Pornography Trafficking (18 U.S.C. § 2252):** This investigation concerns alleged violations of **18 U.S.C. § 2252**, which generally prohibits a person from knowingly transporting, shipping, receiving, distributing, reproducing for distribution, or possessing any visual depiction of minors engaging in sexually explicit conduct when such visual depiction was either mailed or shipped or transported in interstate or foreign commerce by any means, including by computer, or when such visual depiction was produced using materials that had traveled in interstate or foreign commerce.  It is also a crime to attempt to commit this offense.

- **Child Pornography Trafficking (18 U.S.C. § 2252A):** This investigation also concerns alleged violations of **18 U.S.C. § 2252A**, which generally prohibits a person from knowingly mailing, transporting, shipping, receiving, distributing, reproducing for distribution, or possessing any child pornography, as defined in 18 U.S.C. § 2256(8), when such child pornography was either mailed or shipped or transported in interstate or foreign commerce by any means, including by computer, or when such child pornography was produced using materials that had traveled in interstate or foreign commerce.  It is also a crime to attempt to commit this offense.

## DEFINITION OF TERMS

8.     The following terms have the indicated meaning in this affidavit:

a.  The term "minor" is defined at 18 U.S.C. § 2256(1) as any person under the age of eighteen years.

4

b.  The term "sexually explicit conduct" is defined at 18 U.S.C. §
2256(2)(A) as actual or simulated - (i) sexual intercourse, including
genital-genital, oral-genital, anal-genital, or anal-oral, whether between
persons of the same or opposite sex; (ii) bestiality; (iii) masturbation;
(iv) sadistic or masochistic abuse; or (v) lascivious exhibition of the
genitals or pubic area of any person.

c.  The term "email" (electronic mail) is defined as the text messages sent
from one person to another via a computer, which may include
images.  Email can also be sent automatically to a large number of
addresses via a mailing list.

d.  The term "Internet" is defined as the worldwide network of
computers, a noncommercial, self-governing network devoted mostly
to communication and research with roughly 500 million users
worldwide.  The Internet is not an online service and has no real
central hub.  It is a collection of tens of thousands of computer
networks, online services, and single user components.  In order to
access the Internet, an individual computer user must use an access
provider, such as a university, employer, or commercial Internet
Service Provider ("ISP"), which operates a host computer with direct
access to the Internet.

e.  The term "IP" (Internet Protocol) is defined as the primary protocol
upon which the Internet is based.  An IP allows a packet of information
to travel through multiple networks (groups of linked computers) on
the way to its ultimate destination.

f.  The term "IP Address" is defined as a unique number assigned to
every computer directly connected to the Internet (for example
173.18.96.176).  Each computer connected to the Internet is assigned a
unique IP address while it is connected.  By providing the Internet
service provider with the dates, times and IP addresses which a
suspect used to access the Internet, the Internet service provider will be
able to provide the identifying information for the account holder who
was assigned that specific IP address at that date and time, if the

5

records still exist on their system.  The IP address for a user may be relatively static, meaning it is assigned to the same subscriber for long periods of time, or dynamic, meaning that the IP address is only assigned for the duration of that on-line session.

g.   The term "ISP" (Internet Service Provider) is defined as a business that allows a user to dial into or link through its computers thereby allowing the user to connect to the Internet for a fee.  ISPs generally provide only an Internet connection, an electronic mail address, and maybe Internet browsing software.  A user can also connect to the Internet through a commercial online service such as America Online, Earthlink, or MSN.  With this kind of connection, the user gets Internet access and the proprietary features offered by the online service, such as chat rooms and searchable databases.

h.   The term "Online Chat Room" is defined as the real time visual interface which displays messages and responses of participants who are using online chat.  Chat rooms are usually devoted to specific topics such as US politics; however, there are a number of general chat rooms which are devoted to any issue the participants wish to bring up.  Participants usually communicate by typing their contributions into a simple text box line by line.  The primary use of a chat room is to share information via text with a group of other users.  New technology has enabled the use of file sharing and webcams to be included in some programs and almost all Internet chat rooms or messaging services allow users to display and/or send pictures.

i.   The term "Open Source" or "Open Source Software" is defined as software that makes available the software's source code.  This enables the software to be viewed and changed by a programmer.

j.   The term "web site" consists of text pages of information and associated graphic images.  The textual information is stored in a specific format known as Hyper-Text Mark-up Language (HTML) and is transmitted from the web servers to various web clients via Hyper-Text Transport Protocol.

k. The term "computer system and related peripherals, and computer media" as used in this affidavit refers to tapes, cassettes, cartridges, streaming tape, commercial software and hardware, computer disks, disk drives, monitors, computer printers, modems, tape drives, disk application programs, data disks, system disk operating systems, magnetic media floppy disks, hardware and software operating manuals, tape systems and hard drives and other computer-related operation equipment, digital cameras, scanners, in addition to computer photographs, Graphic Interchange formats and/or photographs, and other visual depictions of such Graphic Interchange formats, including, but not limited to, JPG, GIF, TIF, AVI, and MPEG.

## COMPUTERS AND CHILD PORNOGRAPHY

9.     Based upon my knowledge and training in child exploitation and child pornography investigations, and the experience and training of other law enforcement officers with whom I have had discussions, computers and computer technology have revolutionized the way in which child pornography is produced, distributed and utilized. Prior to the advent of computers and the Internet, child pornography was produced using cameras and film, resulting in either still photographs or movies. The photographs required darkroom facilities and a significant amount of skill in order to develop and reproduce the images. As a result, there were definable costs involved with the production of pornographic images. To distribute these images on any scale also required significant resources. The photographs themselves were somewhat bulky and required secure storage to prevent their exposure to the public. The distribution of these wares was accomplished through a combination of personal contacts, mailings, and telephone calls, and compensation for these wares would follow the same paths. More recently, through the use of computers and the Internet, distributors of child

pornography can use membership-based/subscription-based Web sites to conduct business, allowing them to remain relatively anonymous.

10.    In addition, based upon my own knowledge and training in child exploitation and child pornography investigations, and the experience and training of other law enforcement officers with whom I have had discussions, the development of computers has also revolutionized the way in which child pornography collectors interact with, and sexually exploit, children. Computers serve four basic functions in connection with child pornography: production, communication, distribution, and storage. More specifically, the development of computers has changed the methods used by child pornography collectors in these ways:

a.  Producers of child pornography can now produce both still and moving images directly from a common video or digital camera. The camera is attached, using a device such as a cable, or digital images are often uploaded from the camera's memory card, directly to the computer. Images can then be stored, manipulated, transferred, or printed directly from the computer. Images can be edited in ways similar to how a photograph may be altered. Images can be lightened, darkened, cropped, or otherwise manipulated. The producers of child pornography can also use a device known as a scanner to transfer photographs into a computer-readable format. As a result of this technology, it is relatively inexpensive and technically easy to produce, store, and distribute child pornography. In addition, there is an added benefit to the pornographer in that this method of production does not leave as large a trail for law enforcement to follow.

b.  The Internet allows any computer to connect to another computer. By connecting to a host computer, electronic contact can be made to literally millions of computers around the world. A host computer is one that is attached to a network and serves many users. Host computers are sometimes operated by commercial ISPs, such as Microsoft, which allow

8

subscribers to dial a local number and connect to a network, which is in turn, connected to the host systems.  Host computers, including ISPs, allow e-mail service between subscribers and sometimes between their own subscribers and those of other networks.  In addition, these service providers act as a gateway for their subscribers to the Internet or the World Wide Web.

c.  The Internet allows users, while still maintaining anonymity, to easily locate (i) other individuals with similar interests in child pornography; and (ii) Web sites that offer images of child pornography.  Child pornography collectors can use standard Internet connections, such as those provided by businesses, universities, and government agencies, to communicate with each other and to distribute child pornography.  These communication links allow contacts around the world as easily as calling next door.  Additionally, these communications can be quick, relatively secure, and as anonymous as desired.  All of these advantages, which promote anonymity for both the distributor and recipient, are well known and are the foundation of transactions between child pornography collectors over the Internet.  Sometimes the only way to identify both parties and verify the transportation of child pornography over the Internet is to examine the recipient's computer, including the Internet history and cache to look for "footprints" of the Web sites and images accessed by the recipient.

d.  The computer's capability to store images in digital form makes it an ideal repository for child pornography.  A single compact disk can store dozens of images and hundreds of pages of text.  The size of the electronic storage media (commonly referred to as a hard drive) used in home computers has grown tremendously within the last several years.  Hard drives with the capacity of 500 gigabytes are not uncommon.  These drives can store tens of thousands of images at very high resolution.  Magnetic storage located in host computers adds another dimension to the equation.  It is possible to use a video camera to capture an image, process that image in a computer with a video capture board, and save that image to storage in another country.  Once this is done, there is no readily apparent evidence at the "scene of the crime."  Only with careful laboratory examination of electronic storage devices is it possible to recreate the evidence trail.

9

11.     Collectors and distributors of child pornography also use online resources to retrieve and store child pornography, including services offered by Internet Portals such as Yahoo! and Hotmail, among others. The online services allow a user to set up an account with a remote computing service that provides e-mail services as well as electronic storage of computer files in any variety of formats. A user can set up an online storage account from any computer with access to the Internet. Evidence of such online storage of child pornography is often found on the user's computer. Even in cases where online storage is used, however, evidence of child pornography can be found on the user's computer in most cases.

12.     As is the case with most digital technology, communications by way of computer can be saved or stored on the computer used for these purposes. Storing this information can be intentional, i.e., by saving an e-mail as a file on the computer or saving the location of one's favorite websites in, for example, "bookmarked" files.  Digital information can also be retained unintentionally, e.g., traces of the path of an electronic communication may be automatically stored in many places (e.g., temporary files or ISP client software, among others). In addition to electronic communications, a computer user's Internet activities generally leave traces or "footprints" in the web cache and history files of the browser used. A forensic examiner often can recover evidence suggesting whether a computer contains P2P software, when the computer was sharing files, and many of the files which were uploaded or downloaded. Such information is often maintained indefinitely until overwritten by other data. This indefinite retention of

10

information is true even if the computer user has deleted the material. A trained forensic computer examiner can recover files that have been deleted even if the deletion occurred long ago.

13.     Based on my training, experience in numerous related investigations and search warrants, and the experience of other investigators I have talked with, I know that it is common for items of digital media, including but not limited to laptop computers, flash drives, cameras, cell phones, and digital music devices to be transported or stored in motor vehicles. I know that because of the relatively small sized nature of digital media, including those listed above, that there is equal reason to believe that such items can be found on a subject's person or in their motor vehicle.

14.     Based on my training and experience, I know that in addition to being able to make telephone calls and send text messages, many modern cellular telephones (also known as Smartphones) have the ability to browse the internet, download and store images and videos, and take photographs and videos with built in digital cameras.  I know that Secure Digital (SD) cards are commonly used as the digital memory storage device/computer disk within certain electronic devices, such as cellular telephones.  SD cards can store images, videos, and various other digital media and files.  SD cards can be easily removed from one compatible electronic device and used in another and in computers.  I also know that individuals can use portable, wireless tablets (for example, an Apple iPad, a Samsung Galaxy, and even certain models of iPods) to take pictures, record videos, and send that media over email, text messages, or even a messaging service; all of which can then be synchronized to a computer.

11

15.     Yahoo! is a web services provider that, among other functions, provides users with e-mail services, and allows users to communicate via the Internet with other Internet users. Yahoo.com is owned and operated by Verizon Media operating under the entity known as Oath Holdings Inc.

16.     In order to use the email features of Yahoo!, an individual must register with Yahoo! by establishing a unique screen name, user profile, and password.  During registration or at any time after registration, an individual may add other personal information, such as their name, address, telephone number, interests, etc., to their user profile.  After registration is complete with Yahoo!, an email account will be established and accessible for the individual with the email address [unique screen name]@yahoo.com.

## INVESTIGATION

17.     On February 27, 2019, FBI TFO Michael Hockwater, with the Buffalo, New York Division was contacted by the Town of Cheektowaga Police Department who was investigating an incident wherein a 10 year old minor female (hereinafter MV1) had been communicating with an unidentified person (SUBJECT1) utilizing the yahoo email account: scottsanstrom@yahoo.com.  MV1 was using an Apple email account with identifiers known to me. SUBJECT1 sent MV1 naked pictures of himself and requested that MV1 send him pictures showing her naked body. On February 27, 2019, TFO Hockwater spoke with the father of MV1 who authorized a search of her iPad.

18.     On March 1, 2019, TFO Hockwater searched the iPad belonging to MV1 and found several emails between MV1 and scottsandstrom@yahoo.com.  The email

communications between MV1 and the scottsanstrom@yahoo.com began on February 21, 2019 and ended on February 25, 2019.  On February 21, 2019 at 2:24 PM EST, MV1 sent a picture of her genital area to the scottsanstrom@yahoo.com. On the same day at 3:19 PM EST, MV1 sent a naked picture of her whole body to the scottsanstrom@yahoo.com. On February 21, 2019 at 4:35 PM EST, the user of the scottsanstrom@yahoo.com account sent MV1 an email stating "Good I miss you, Can I still call you babe". On the same day at 4:38 PM EST, the user of the scottsanstrom@yahoo.com account sent MV1 a picture of his genitals. Additional pictures the user of the scottsanstrom@yahoo.com account sent to MV1 includes his genitals, his buttocks, his torso, including his nipples, and a separate picture depicting his face with a single nipple displayed. On the same day at 4:42 PM EST, the user of the scottsanstrom@yahoo.com account sent MV1 and email stating, "Send me sexy video of you". Four minutes later, the user of the scottsanstrom@yahoo.com account sent MV1 an email stating, "send me rub pussy".

19.     On March 5, 2019, MV1 was forensically interviewed at the Child Advocacy Center in Buffalo, New York. MV1 stated that she had first met SUBJECT1 at the end of 2018 before Christmas on a mobile application called "MLB9INNINGS"and soon after their communications switched to email. MV1 posted on her "MLB9INNINGS" account that she was 10 years old. SUBJECT1 used email address scottsanstrom@yahoo.com. MV1 stated that SUBJECT1 initially told her that he was 11 years old and asked her to send him naked pictures of herself. At the request of SUBJECT1, MV1 sent several pictures of herself displaying her genitals to the scottsanstrom@yahoo.com. SUBJECT1 also sent MV1 pictures of his genitals and his face at which time MV1 realized that SUBJECT1 was

13

older estimating that he was in his thirties. SUBJECT1 told MV1 that he wanted to drive to her house to meet her in person.

20.    On or about March 28, 2019, TFO Hockwater sent an Administrative Subpoena to Oath Holdings, requesting subscriber information and IP logs for the scottsanstrom@yahoo.com account. On March 13, 2019, TFO Hockwater reviewed the results of that subpoena and discovered that the subscriber was Scott Sanstrom,

Urbana, Illinois 61802, telephone number        . The subpoena return also provided IP connection logs. The most recent login was on February 26, 2019 at 7:20:42 PM (GMT). The IP address used at that date and time was 2601:240:8201:9e0:3d8f:b3e1:f561:4a48. A subpoena to Comcast for that IP address identified the subscriber as Scott Sanstrom,                    . Urbana, IL 61802, telephone number

21.    On or about March 25, 2019, TFO Hockwater conducted an open source internet search of the name Scott Sanstrom and found evidence he does reside at

. Urbana, IL 61802 and that he uses telephone number

22.    On May 13, 2019, I conducted surveillance at the subject premises and noticed there was a note on the door of                The note said, "Micahel [sic] Greene don't disturb Scott between 6a.m. to 10:00p.m." I further observed that the mailbox for              had the name "S. Sanstrom" affixed to it.

## BACKGROUND ON CHILD PORNOGRAPHY, COMPUTERS, AND THE INTERNET

23.     I have had both training and experience in the investigation of computer-related crimes.  Based on my training, experience, and knowledge, I know the following:

a.  Computers and digital technology are the primary way in which individuals interested in child pornography interact with each other. Computers basically serve four functions in connection with child pornography:  production, communication, distribution, and storage.

b.  Digital cameras and smartphones with cameras save photographs or videos as a digital file that can be directly transferred to a computer by connecting the camera or smartphone to the computer, using a cable or via wireless connections such as "WiFi" or "Bluetooth."  Photos and videos taken on a digital camera or smartphone may be stored on a removable memory card in the camera or smartphone.  These memory cards are often large enough to store thousands of high-resolution photographs or videos.

c.   A device known as a modem allows any computer to connect to another computer through the use of telephone, cable, or wireless connection. Mobile devices such as smartphones and tablet computers may also connect to other computers via wireless connections.  Electronic contact can be made to literally millions of computers around the world.  Child pornography can therefore be easily, inexpensively and anonymously (through electronic communications) produced, distributed, and received by anyone with access to a computer or smartphone.

d.  The computer's ability to store images in digital form makes the computer itself an ideal repository for child pornography.  Electronic storage media of various types – to include computer hard drives, external hard drives, CDs, DVDs, and "thumb," "jump," or "flash" drives, which are very small devices which are plugged into a port on the computer – can store thousands of images or videos at very high resolution.  It is extremely easy for an individual to take a photo or a video with a digital camera or camera-bearing smartphone, upload that

15

photo or video to a computer, and then copy it (or any other files on the computer) to any one of those media storage devices. Some media storage devices can easily be concealed and carried on an individual's person. **Smartphones and/or mobile phones are also often carried on an individual's person.**

e.   The Internet affords individuals several different venues for obtaining, viewing, and trading child pornography in a relatively secure and anonymous fashion.

f.   Individuals also use online resources to retrieve and store child pornography. Some online services allow a user to set up an account with a remote computing service that may provide e-mail services and/or electronic storage of computer files in any variety of formats. A user can set up an online storage account (sometimes referred to as "cloud" storage) from any computer or smartphone with access to the Internet. Even in cases where online storage is used, however, evidence of child pornography can be found on the user's computer, smartphone or external media in most cases.

g.   As is the case with most digital technology, communications by way of computer can be saved or stored on the computer used for these purposes. Storing this information can be intentional (*i.e.*, by saving an e-mail as a file on the computer or saving the location of one's favorite websites in, for example, "bookmarked" files). Digital information can also be retained unintentionally such as the traces of the path of an electronic communication may be automatically stored in many places (*e.g.*, temporary files or ISP client software, among others). In addition to electronic communications, a computer user's Internet activities generally leave traces or "footprints" in the web cache and history files of the browser used. Such information is often maintained indefinitely until overwritten by other data.

## SPECIFICS OF SEARCH AND SEIZURE OF COMPUTER SYSTEMS

24.   As described above and in Attachment B, this application seeks permission to search for records that might be found on the premises, in whatever form they are

16

found. One form in which the records might be found is data stored on a computer's hard drive or other storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

25.     I submit that if a computer or storage medium is found on the Subject Premises, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

    a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

    b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space — that is, in space on the storage medium that is not currently being used by an active file — for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

    c. Wholly apart from user-generated files, computer storage media — in particular, computers' internal hard drives — contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase

or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.

    d.  Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

26.    As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the premises because:

    a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

    b.  As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove

18

each element or alternatively, to exclude the innocent from further suspicion.

c.  In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner.

d.  Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used.  For example, as described herein, computers typically contain information that log:  computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet.  Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation.

e.  Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect.  For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data.  Such file data typically also contains information indicating when the file or image was created.  The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera).  The geographic and timeline information described herein may either inculpate or exculpate the computer user.

19

Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

f. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

g. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

h. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

i. I know that when an individual uses a computer to obtain or access child pornography, the individual's computer will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The computer is an instrumentality of the crime because it is used as a means of committing the criminal offense.

20

The computer is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that a computer used to commit a crime of this type may contain data that is evidence of how the computer was used, data that was sent or received, notes as to how the criminal conduct was achieved, records of Internet discussions about the crime, and other records that indicate the nature of the offense.

27.    Based upon my training and experience and information relayed to me by agents and others involved in the forensic examination of computers, I know that computer data can be stored on a variety of systems and storage devices, including external and internal hard drives, flash drives, thumb drives, micro SD cards, macro SD cards, DVDs, gaming systems, SIM cards, cellular phones capable of storage, floppy disks, compact disks, magnetic tapes, memory cards, memory chips, and online or offsite storage servers maintained by corporations, including but not limited to "cloud" storage. I also know that during the search of the premises it is not always possible to search computer equipment and storage devices for data for a number of reasons, including the following:

     a.  Searching computer systems is a highly technical process which requires specific expertise and specialized equipment. There are so many types of computer hardware and software in use today that it is impossible to bring to the search site all of the technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may also be necessary to consult with computer personnel who have specific expertise in the type of computer, software website, or operating system that is being searched;

     b.  Searching computer systems requires the use of precise, scientific procedures which are designed to maintain the integrity of the evidence and to recover "hidden," erased, compressed, encrypted, or password-protected data. Computer hardware and storage devices may contain

21

"booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Since computer data is particularly vulnerable to inadvertent or intentional modification or destruction, a controlled environment, such as a law enforcement laboratory, is essential to conducting a complete and accurate analysis of the equipment and storage devices from which the data will be extracted;

c. The volume of data stored on many computer systems and storage devices will typically be so large that it will be highly impractical to search for data during the execution of the physical search of the premises; and

d. Computer users can attempt to conceal data within computer equipment and storage devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Computer users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. In addition, computer users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography a computer user can conceal text in an image file which cannot be viewed when the image file is opened. Therefore, a substantial amount of time is necessary to extract and sort through data that is concealed or encrypted to determine whether it is contraband, evidence, fruits, or instrumentalities of a crime.

28.     Additionally, based upon my training and experience and information related to me by agents and others involved in the forensic examination of computers, I know that routers, modems, and network equipment used to connect computers to the Internet often provide valuable evidence of, and are instrumentalities of, a crime. This is equally true of so-called "wireless routers," which create localized networks that allow

individuals to connect to the Internet wirelessly.  Though wireless networks may be "secured" (in that they require an individual to enter an alphanumeric key or password before gaining access to the network) or "unsecured" (in that an individual may access the wireless network without a key or password), wireless routers for both secured and unsecured wireless networks may yield significant evidence of, or serve as instrumentalities of, a crime—including, for example, serving as the instrument through which the perpetrator of the Internet-based crime connected to the Internet and, potentially, containing logging information regarding the time and date of a perpetrator's network activity as well as identifying information for the specific device(s) the perpetrator used to access the network.  Moreover, I know that individuals who have set up either a secured or unsecured wireless network in their residence are often among the primary users of that wireless network.

29.     Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## CHARACTERISTICS COMMON TO INDIVIDUALS WHO DISTRIBUTE, RECEIVE, POSSESS, AND/OR PRODUCE CHILD PORNOGRAPHY

30.     Based on my previous investigative experience related to child exploitation investigations, and the training and experience of other law enforcement officers with whom I have had discussions, I know there are certain characteristics common to individuals who distribute, receive, possess, and/or produce child pornography:

a. Such individuals may receive sexual gratification, stimulation, and satisfaction from contact with children, or from fantasies they may have viewing children engaged in sexual activity or in sexually suggestive poses, such as in person, in photographs, or other visual media, or from literature describing such activity.

b. Such individuals may collect sexually explicit or suggestive materials in a variety of media, including photographs, magazines, motion pictures, videotapes, books, slides and/or drawings or other visual media. Individuals who have a sexual interest in children or images of children oftentimes use these materials for their own sexual arousal and gratification. Further, they may use these materials to lower the inhibitions of children they are attempting to seduce, to arouse the selected child partner, or to demonstrate the desired sexual acts.

c. Such individuals almost always possess and maintain their hard copies of child pornographic material, that is, their pictures, films, video tapes, magazines, negatives, photographs, correspondence, mailing lists, books, tape recordings, etc., in the privacy and security of their home or some other secure location. Individuals who have a sexual interest in children or images of children typically retain pictures, films, photographs, negatives, magazines, correspondence, books, tape recordings, mailing lists, child erotica, and videotapes for many years.

d. Likewise, such individuals often maintain their child pornography images in a digital or electronic format in a safe, secure and private environment, such as a computer and surrounding area. These child pornography images are often maintained for several years and are kept

24

close by, usually at the possessor's residence, inside the possessor's vehicle, or, at times, on their person, to enable the individual to view the child pornography images, which are valued highly. Some of these individuals also have been found to download, view, and then delete child pornography on their computers or digital devices on a cyclical and repetitive basis.

e.   Importantly, evidence of such activity, including deleted child pornography, often can be located on these individuals' computers and digital devices through the use of forensic tools. Indeed, the very nature of electronic storage means that evidence of the crime is often still discoverable for extended periods of time even after the individual "deleted" it.[1]

f.   Such individuals also may correspond with and/or meet others to share information and materials, rarely destroy correspondence from other child pornography distributors/possessors, conceal such correspondence as they do their sexually explicit material, and often maintain lists of names, addresses, and telephone numbers of individuals with whom they have been in contact and who share the same interests in child pornography.

g.   Such individuals prefer not to be without their child pornography for any prolonged time period. This behavior has been documented by law enforcement officers involved in the investigation of child pornography throughout the world. Thus, even if "**scottsanstrom@yahoo.com**" or **Sanstrom** uses a portable device (such as a mobile phone) to access the internet and child pornography, it is more likely than not that evidence of this access will be found in his home, the Subject Premises, as set forth in Attachment A.

---

[1] See *United States v. Carroll*, 750 F.3d 700, 706 (7th Cir. 2014) (concluding that 5-year delay was not too long because "staleness inquiry must be grounded in an understanding of both the behavior of child pornography collectors and of modern technology"); *see also United States v. Seiver*, 692 F.3d 774 (7th Cir. 2012) (Posner, J.) (collecting cases, *e.g., United States v. Allen*, 625 F.3d 830, 843 (5th Cir. 2010); *United States v. Richardson*, 607 F.3d 357, 370–71 (4th Cir. 2010); *United States v. Lewis*, 605 F.3d 395, 402 (6th Cir. 2010).)

31.     Based    on    the    following,    I    believe    that    the    user    of
"scottsanstrom@yahoo.com" residing at subject premises likely displays characteristics
common to individuals who distribute, possess or produces child pornography.  For
example, the target of investigation:

      a.  solicited pornographic images of a minor he knew or believed to be ten
          years old.

      b.  misrepresented his identity, claiming to be an eleven year old in order
          to lure or entice MV1 to engage in sexually graphic communications;

      c.  sent pornographic images of himself to MV1 in order to entice and
          induce MV1 to send pornographic images of herself in return.

## BIOMETRIC ACCESS TO DEVICES

32.     This warrant permits law enforcement to compel **Scott M. Sanstrom**  (M/W
D.O.B.       1981) (but not any other individuals present at the premises at the time of
execution of the warrant) to display any physical biometric characteristics (such as
fingerprint/thumbprint or facial characteristics) necessary to unlock any Device(s)
requiring such biometric access subject to seizure pursuant to this warrant for which law
enforcement has reasonable suspicion that the aforementioned person(s)' physical
biometric characteristics will unlock the Device(s).  The grounds for this request are as
follows:

      a.  I know from my training and experience, as well as from information
          found   in   publicly   available   materials   published   by   device
          manufacturers, that many electronic devices, particularly newer mobile
          devices and laptops, offer their users the ability to unlock the device

through biometric features in lieu of a numeric or alphanumeric passcode or password.  These biometric features include fingerprint scanners, facial recognition features, and iris recognition features.  Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

b.  If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints.  For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device.  Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device.  The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

c.  If a device is equipped with a facial-recognition feature, a user may enable the ability to unlock the device through his or her face.  For example, this feature is available on certain Android devices and is called "Trusted Face."  During the Trusted Face registration process, the user holds the device in front of his or her face.  The device's front-facing camera then analyzes and records data based on the user's facial characteristics.  The device can then be unlocked if the front-facing camera detects a face with characteristics that match those of the registered face.  Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Trusted Face.

d.  If a device is equipped with an iris-recognition feature, a user may enable the ability to unlock the device with his or her irises.  For example, on certain Microsoft devices, this feature is called "Windows Hello."  During the Windows Hello registration, a user registers his or her irises by holding the device in front of his or her face.  The device then directs an infrared light toward the user's face and activates an infrared-sensitive camera to record data based on patterns within the user's irises.  The device can then be unlocked if the infrared-sensitive

camera detects the registered irises. Iris-recognition features found on devices produced by other manufacturers have different names but operate similarly to Windows Hello.

33.     In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

34.     As discussed in this Affidavit, your Affiant has reason to believe that one or more digital devices will be found during the search. The passcode or password that would unlock the devices subject to search under this warrant currently is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the devices, making the use of biometric features necessary to the execution of the search authorized by this warrant.

35.     I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when: (1) more than 48 hours has elapsed since the device was

last unlocked; or, (2) when the device has not been unlocked using a fingerprint for 8 hours and the passcode or password has not been entered in the last 6 days. Similarly, certain Android devices cannot be unlocked with Trusted Face if the device has remained inactive for four hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

36.     Due to the foregoing, if law enforcement personnel encounter any devices that are subject to seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, this warrant permits law enforcement personnel to: (1) press or swipe the fingers (including thumbs) of Scott M. Sanstrom to the fingerprint scanner of the devices found at the premises; (2) hold the devices found at the premises in front of the face of Scott M. Sanstrom and activate the facial recognition feature; and/or (3) hold the devices found at the premises in front of the face of Scott M. Sanstrom and activate the iris recognition feature, for the purpose of attempting to unlock the devices in order to search the contents as authorized by this warrant. The proposed warrant does not authorize law enforcement to request that Scott M. Sanstrom state or otherwise provide the password or any other means that may be used to unlock or access the devices. Moreover, the proposed warrant does not authorize law enforcement to ask Scott M. Sanstrom to identify the specific biometric characteristics (including the unique finger(s) or other physical features) that may be used to unlock or access the devices.

## REQUEST TO SEAL

37.     It is further requested that this Affidavit be sealed by the Court until such time as the Court directs otherwise. Given the confidential nature of this investigation, disclosure would severely jeopardize the investigation in that it might alert the target of the investigation at the Subject Premises to the existence of an investigation and likely lead to the destruction and concealment of evidence, and/or flight.

## CONCLUSION

38.     Based on the aforementioned factual information, I respectfully submit that there is probable cause to believe that an individual in the residence described above, the subject premises, therefore has violated Title 18, United States Code, Sections 2251(a), 2252 and 2252A. Additionally, there is probable cause to believe that evidence of the commission of criminal offenses, namely, violations of Title 18, United States Code, Sections 2251(a), 2252 and 2252A, is located in the residence described above or on the subject persons, specifically Scott M. Sanstrom, and this evidence, listed in Attachment B to this affidavit, which is incorporated herein by reference, is contraband, the fruits of crime, or things otherwise criminally possessed, or property that is or has been used as the means of committing the foregoing offenses.

39.    I therefore respectfully request that the attached warrant be issued authorizing the search of the Subject Premises further described in Attachment A1 and A2 and seizure of the items listed in Attachment B.

Respectfully submitted,

s/Joel C. Smith

Joel C. Smith
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me
this 15th day of May, 2019.
s/Eric I. Long

Eric I. Long
United States Magistrate Judge

31

## ATTACHMENT A1

### DESCRIPTION OF LOCATION TO BE SEARCHED

The entire premises of                                Urbana, IL 61802. This premises is a
two-story apartment building with blue and white aluminum siding that is located on
the north side of Kerr Ave; a sign stating "CU Independence Apartments, 610 E. Kerr
Ave." is displayed in front of the building.                      is on the first floor on the
north east side of the building, the numbers "      ' is affixed to the brown, wood grain
door.





1

## ATTACHMENT A2

## DESCRIPTION OF PERSONS TO BE SEARCHED

A pat down search of any person located at the subject premises, including specifically person of **Scott M. Sanstrom** (DOB: ⁏        1981), provided that this person is located at the Subject Premises and/or within the Central District of Illinois at the time of the search.



2

# ATTACHMENT B

## ITEMS TO BE SEIZED

The following materials, which constitute evidence of the commission of a criminal offense, contraband, the fruits of crime, or property designed or intended for use or which is or has been used as the means of committing a criminal offense, namely violations of Title 18, United States Code, Sections 2251, 2252 and 2252A:

1. Computers or storage media used as a means to commit the violations described above.

2. For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

   a. evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

   b. evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

   c. evidence of the lack of such malicious software;

   d. evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to the crime(s) under investigation and to the computer user;

   e. evidence indicating the computer user's knowledge and/or intent as it relates to the crime(s) under investigation;

   f. evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

3

g.  evidence of programs (and associated data) that are designed to eliminate data from the COMPUTER;

h.  evidence of the times the COMPUTER was used;

i.  passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

j.  documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

k.  records of or information about Internet Protocol addresses used by the COMPUTER;

l.  records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses; and

m.  contextual information necessary to understand the evidence described in this attachment.

3.  Routers, modems, and network equipment used to connect computers to the Internet.

4.  Child pornography and child erotica, any images of minors used to assist in identifying children depicted in child pornography and erotica.

5.  Records, information, and items relating to violations of the statutes described above including:

a.  Records, information, and items relating to the occupancy or ownership of the Subject Premises, including utility and telephone bills, mail envelopes, or addressed correspondence;

b.  Records, information, and  items relating to the ownership or use of computer equipment found in the above residence, including sales receipts, bills for Internet access, and handwritten notes;

c.  Records and information relating to the identity or location of the persons suspected of violating the statutes described above;

4

     d.  Records and information relating to the sexual exploitation of children, including correspondence and communications between users of Yahoo.com and MLB9INNINGS social media accounts;

     e.  Records and information showing access to and/or use of these accounts; and

     f.  Records and information relating or pertaining to the identity of the "scottsanstrom@yahoo.com" person or persons using or associated with this account.

6.  Photographs of the Scott Sanstrom's face, genitals, buttocks, and torso including nipples, to compare to images sent from "scottsanstrom@yahoo.com".

As used above, the terms "records" and "information" include all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded, including external and internal hard drives, flash drives, thumb drives, micro SD cards, macro SD cards, DVDs, gaming systems, SIM cards, cellular phones capable of storage, floppy disks, compact discs, magnetic tapes, memory cards, memory chips, and other magnetic or optical media.

During the course of the search, photographs of the searched premises may also be taken to record the condition thereof and/or the location of items therein.

During the execution of the search of the premises described in Attachment A1, law enforcement personnel are also specifically authorized to compel **Scott M. Sanstrom (D.O.B.** /1981) to display any biometric features, including pressing their fingers

5

(including thumbs) against and/or putting their face before the sensor, or any other security feature requiring biometric recognition, of:

(a)    any of the devices found at the subject premises, and

(b)    where the devices are limited to those which are capable of containing and reasonably could contain fruits, evidence, information, contraband, or instrumentalities of the offense(s) as described in the search warrant affidavit and warrant attachments,

for the purpose of attempting to unlock the device's security features in order to search the contents as authorized by this warrant.

This warrant does not authorize law enforcement personnel to compel any other individuals found at the premises to provide biometric features, as described in the preceding paragraph, to access or otherwise unlock any device.  Further, this warrant does not authorize law enforcement personnel to request that **Scott M. Sandstrom** state or otherwise provide the password or any other means that may be used to unlock or access the devices, including by identifying the specific biometric characteristics (including the unique finger(s) or other physical features) that may be used to unlock or access the device.

6